**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**AMARILLO DIVISION**

| | | |
|---|---|---|
| WILLIAM PLEMONS, | § § | |
| PLAINTIFF, | § | |
| v. | § § | CIVIL ACTION CAUSE NUMBER 2:03-CV-421-J |
| MICHAEL AMOS, et al., | § § | |
| DEFENDANTS. | § | |

**OPINION**

Plaintiff William E. Plemons alleges that his constitutional rights to be free from the use of excessive force and unlawful search and seizure of his person were violated by officers in the execution of a raid by the Texas Panhandle Regional Narcotics Trafficking Task Force of an establishment in which he was a patron. Plaintiff has not sued any person who is alleged to have participated in the initial entry, who is alleged to have used excessive force in securing Plaintiff's person during the raid, or who allegedly participated in an unlawful search. He contends that the defendants failed to train, failed to supervise, or had policies, procedures, and customs that permitted violation of those rights.

Plaintiff sues the City of Amarillo, Potter County, Randall County, Swisher County, and the Texas Panhandle Regional Narcotics Trafficking Task Force.

He sues Amarillo Police Department Chief Jerry Neal, Randall County Sheriff Joel Richardson, and Potter County Sheriff Mike Shumate only in their official capacity as members of the Board of Governors of the Task Force.

He sues Swisher County Sheriff Larry Stewart individually, as well as in his official capacity as Sheriff of Swisher County and as a member of the Board of Governors of the Task Force.

He sues Amarillo Police Department Lieutenant Michael Amos individually, as well as in his official capacity as a member of the Task Force and the Amarillo Police Department.

No person sued individually or in his official capacity was at the scene during any portion of the raid and search except for Lt. Amos, who was briefly at the scene shortly after the scene was secured.

Lt. Amos and Sheriff Stewart, the only two persons sued in their individual capacity, claim that they are entitled to qualified immunity. All defendants deny that Plemons' constitutional rights were violated and further assert that the Task Force is not an entity that can be sued.

The matter is before the Court on Defendants' motions for summary judgment.

**Factual Background**

An agreed joint stipulation of facts has been filed by the parties. The parties have filed numerous depositions as a part of their summary judgment evidence. For the purpose of ruling on Defendants' motions for summary judgment, this Court has resolved all factual uncertainties and made all reasonable inferences in favor of Plaintiff.

On December 13, 2001, the Texas Panhandle Regional Narcotics Trafficking Task Force (Task Force) and the Amarillo Police Department's (APD) SWAT team jointly executed a search warrant at the Morris Furniture Store in Amarillo. The warrant was for a "suspected place" described as "a single story, single family dwelling located at 1701 Southeast Tenth Avenue" in Amarillo, Potter County, Texas. The location was further described as having "a business sign on the south side of the property that has written on it 'Morris Furniture' and the number '1701 E. 10th'." This location was believed to contain "a usable amount of amphetamine." The affidavit of

Amarillo Police Department case agent Corporal Tony Elsis supporting the search warrant was incorporated into the warrant "for all purposes." It specifically requested "issuance of a warrant that will authorize the search of said suspected place and all edifices, outbuildings, and the curtilage" thereof.

Undercover APD Task Force Officer Vern Wilson and eight APD SWAT Officers entered the suspected location first, through doors leading into the public or business portion of the premises. They shouted "police" and yelled orders for all persons present to immediately get face down on the floor. Some or all of the SWAT Team officers entered carrying automatic and/or semiautomatic weapons. The officers on the raid wore black face masks, hiding their faces, and black uniforms with "POLICE" written on the front.

None of the Potter, Randall, or Swisher County deputies made the initial entry. After the building was secure the Task Force narcotics search team went in. Because the area to be searched was so large, the APD SWAT Team officers as well as officers from several other law enforcement agencies assisted in the search.

Participating in the search were a deputy sheriff from each of Potter, Randall and Swisher Counties, as members of the Task Force, and numerous officers from the Amarillo Police Department, including eight APD SWAT team members as well as eight or more other APD officers regularly assigned to the Task Force. Also present were one agent with the United States Drug Enforcement Administration and two Texas Department of Public Safety officers. At least twenty officers participated in the drug raid, searching for drugs and for illegal weapons.[1] The highest

---

[1] Some of the officers participating in the raid were deposed. Their testimony was that before the raid at issue Delbert Morris was known to deal drugs and to have weapons on the premises, and that the officers believed he had more than one arrest for assaultive behavior. Morris drew Task Force attention as a result of an earlier drug raid elsewhere, from which the police were tipped that Morris was a source

ranking Task Force officer continually present was APD Sergeant Ottoson, SWAT Team Sergeant Williams was on the raid. Planning of the raid was by the case agent, APD Corporal Elsis.

At the time of entry Plaintiff was a customer in the store. The only other persons present were Morris and a store clerk. Plaintiff was near one of the shop areas, somewhat close to Morris. When ordered to the floor Plaintiff got down on the toes of his boots and the palms of his hands, and tried to ease down flat on the wet floor as the officers approached. As numerous officers approached – perhaps as many as ten – he told officers that he could not get down any quicker because he had a problem with a plastic aortic graft. He testified in his deposition as follows:

> "And when the officers approached me, I was actually on my hands and my toes, and I told him that I couldn't get down any quicker, because I had this problem with this graft. And they began to holler and said they didn't care anything about that, and just screaming and hollering and started stomping me and put me down. And actually my face went into this wet floor in here and my shirt was wet and all from all the water that was on the floor right there. ... I was explaining to them I had a plastic aorta and that, you know, I was doing my best to get down and they started stomping me and screaming and hollering and putting me down forcefully."

Plaintiff testified that it was probably a minute that the "stomping and smashing" went on. APD Officer Wilson handcuffed him. Police officers then yanked him up and set him on a couch by a southern door.

Swisher County Deputy Sheriff Len Sharp was assigned to stand by and watch the Plaintiff. Plaintiff told Sharp that he was hurting and that he needed to stand up to relieve pain in his groin areas. Deputy Sharp permitted Plaintiff to stand up. Sharp then left to go to a telephone to run a check on Plaintiff's identity without first asking Plaintiff for his name.

---

of the weapons and drugs found in the earlier raid. The officers also knew from an earlier arrest that Morris had weapons at his store. They therefore considered the raid to be a "high risk warrant" calling for SWAT Team involvement. The SWAT Team went in first, followed by Task Force officers.

While Sharp was gone, another officer in a DEA jacket ordered Plaintiff to sit back down. Plaintiff told the second officer that the deputy said that he could stand up. The second officer responded "if you don't sit down I'm going to put you down again."

Plaintiff consented to the search of his pickup truck parked in front of the business. An officer got the key from the Plaintiff, went out to the truck, looked inside the console, then returned the key to Plaintiff.

Deputy Sharp returned and informed Plaintiff that he did not have a valid driver's license. Plaintiff told Sharp that if Sharp reached into Plaintiff's left front pocket Sharp would find Plaintiff's driver's license. The deputy got his license, went to the telephone, called in, came back and told Plaintiff that he was "all clear."

Possibly in as little as five minutes after being told that he was clear Plaintiff was told that he could go. Approximately two and one-half hours after the entry, Plaintiff was released from handcuffs and left the premises. Plaintiff was not charged with a crime.

Although Plaintiff informed the police officers that he was hurting in both of his groin areas he did not request medical treatment.

Delbert Morris was arrested for possession of drugs and illegal weapons.

Plaintiff claims that as a result of the force used against him he suffered a crush injury to his graft which led to an infection that in turn, in the course of an 18 month period, caused an occlusion of his aortobifemoral graft.

## DISCUSSION AND ANALYSIS

Plaintiff alleges that actions taken in execution of the search warrant were done because of failure to train and supervise and pursuant to police policies that violate his constitutional right to be free of excessive force and unlawful search and seizure of his person.

Supervisory officials cannot be held liable under section 1983 for the actions of subordinates on any theory of vicarious or *respondeat superior* liability. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)*; Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff must therefore show that the conduct, actions or inactions of each individual supervisor or entity denied him his constitutional rights. *See Evett v. DETNTFF,* 330 F.3d 681, 689 (5th Cir. 2003); *Alton v. Texas A&M Univ.,* 168 F.3d 196, 201 (5th Cir. 1999); *Thompkins v. Belt,* 828 F.2d 298, 303-04 (5th Cir. 1987).

Alleged failures to control and discipline are a failure to supervise. When a plaintiff alleges a failure to train or supervise, that "plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Smith v. Brenoettsy,* 158 F.3d 908, 911-12 (5th Cir. 1998); *see Burge v. St. Tammany Parish,* 336 F.3d 363, 370 (5th Cir. 2003); *Cousin v. Small,* 325 F.3d 627, 637 (5th Cir. 2003); *Thompson,* 245 F.3d at 459; *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 452-54 & nn.7-8 (5th Cir. 1994)(*en banc*)(adopting the *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), standard of municipal liability requiring at least deliberate indifference for supervisory liability).

Claims of inadequate supervision and control and claims of inadequate training both generally require that the plaintiff demonstrate a pattern. *Burge,* 336 F.3d at 370 (proof of deliberate indifference "generally requires a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights'")(quoting *Thompson,* 245 F.3d at 459); *accord Cousin,* 325 F.3d at 637; *cf. Brown v. Bryan County,* 219 F.3d 450, 462 (5th Cir. 2000)

(concluding that single decision constituted "deliberate indifference" where there was "*no* training (and *no* supervision)" of the subordinate).

Earlier indications of unconstitutional actions undertaken pursuant to the police policy claimed to be unconstitutional cannot simply be for any and all "bad" or unwise acts; Plaintiff must point to the specific constitutional violations in question. *Trepagnier,* 142 F.3d at 798; *see also Burge,* 336 F.3d at 371 (evidence "not sufficient to establish deliberate indifference or knowledge" that a constitutional violation "would be a highly likely consequence"); *cf. Bryan County,* 520 U.S. at 412, 117 S.Ct. 1382 (holding that a finding of supervisory liability for inadequate screening "must depend on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff"). That is, notice of a pattern of *similar* violations is required. *See Roberts,* 397 F.3d at 294 (rejecting plaintiffs' proffered pattern where it required "an excessively high level of generality"). While the specificity required should not be exaggerated, cases require that the prior acts be fairly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act have involved injury to a third party. *See, e.g., Snyder,* 142 F.3d at 798 ("[P]laintiff must demonstrate at least a pattern of similar incidents in which the citizens were injured." (internal quotation marks and citation omitted)); *see also Gros,* 209 F.3d at 435 (noting in hiring case that subordinate had never "used excessive force against any third party").

*Excessive Force*

The summary judgment evidence establishes that all participants received adequate training and that there was no official policy allowing use of excessive force. There is no summary judgment evidence to the contrary.

Plaintiff has offered no evidence of a pattern of excessive force during the execution of search warrants or of any similar acts of excessive force of which a supervisor should have been

aware.  Plaintiff rather relies on dissimilar acts that allegedly occurred in Tulia, Texas, and which did not involve excessive force or unlawful detention.

Plaintiff neither alleges nor points to any prior acts or a pattern of similar acts involving an excessive force injury to a third party.  Plaintiff has wholly failed to show a pattern of deliberate indifference to uses of excessive force.

Further, this case does not fit the so-called "single incident exception" to the pattern of similar excessive force violations requirement.  That exception is inherently "a narrow one, and one that" courts "have been reluctant to expand." *Estate of Davis,* 406 F.3e at 385-86 (citing *Burge,* 336 F.3d at 373); *Pineda,* 291 F.3d at 334- 35; *Gabriel v. City of Plano,* 202 F.3d 741, 745 (5th Cir. 2000)("We have consistently rejected application of the single incident exception and have noted that 'proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.'"); *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998); *Conner v. Travis County,* 209 F.3d 794, 797 (5th Cir. 2000)).  To rely on the exception, Plaintiff must prove that the "highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation." *Roberts,* 397 F.3d at 295 (quoting *Brown,* 219 F.3d at 461).  In view of the fact that the raid was considered high risk justifying some initial use of force to establish control of the premises, the fact that by Plaintiff's own testimony the use of force lasted only a minute or less, the level of documented training in the record in this case, and the lack of a history or pattern of excessive force complaints, this case does not fit within the single-incident exception.

*Searches of Plaintiff's Person and Automobile*

Plaintiff cannot recover on his claim of unlawful search of himself and his pickup. Plaintiff testified that he instructed Deputy Sharp to take his driver's license from his pocket and that he consented to the police request to search his vehicle. These facts negate liability for any alleged constitutional violations arising from the search of Plaintiff's person for his driver's license or his car keys, or the search of his pickup truck.[2] In short, Plaintiff consented to the limited search of his person and to the search of his pickup truck.

Summary judgment will be entered for all Defendants on Plaintiff's claims of excessive force and alleged injuries from the use of excessive force, as well as claims of unlawful search.

The Court must then determine whether any of the persons or entities sued can be liable for an unconstitutional detention, if that occurred.

*Unconstitutional Detention*

Plaintiff claims that the Task Force, and the Amarillo Police Department, had an official search policy, custom and practice which unconstitutionally prolonged the detention of innocent bystanders. The alleged policy was to hold all persons, including innocent bystanders, found upon the business premises of a place to be searched as suspects or potential suspects, and to detain them until the entire search had been completed and the searching officers concluded that incriminating evidence had not been found or would not be found.

---

[2] While Plaintiff did not specifically claim in his deposition that a "patdown" search did occur, it is not disputed that the officers expected to find, and did find, weapons on the searched premises. *Cf. Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1982)(patdown to check for weapons is permissible under limited circumstances, such as here, where police reasonably believed person on premises to be armed and dangerous).

**The Task Force**

Defendants contend that the Task Force is not an entity that can be sued.

The Task Force has been disbanded. It no longer exists. It was created as an inter-governmental, manpower-sharing arrangement. Each inter-governmental agreement was executed with the City of Amarillo. At least twenty-three (23) Panhandle counties, and some, but not all, of the cities in the Panhandle of Texas executed agreements.

The Task Force was funded in major part by federal grants applied for by the City of Amarillo and administered as part of the Texas Narcotics Control Program by the Office of the Governor, Criminal Justice Division. The balance of its funds came from the participating Panhandle cities and counties. While it existed it had no bank checking accounts; all of its bills were paid by the City of Amarillo. All persons assigned to the Task Force were paid by the jurisdiction where they were regularly employed. Those jurisdictions were then reimbursed by funds from the grants.

The Task Force's day to day operations were run by an APD-employed supervisor, Lt. Amos. The majority of its agents and supervisors were APD officers. All complaints against Task Force agents were to be investigated as set forth in the Amarillo Police Department rules and regulations, but, if the complaints were determined to be founded, any discipline was to be determined by the agent's home department. The Task Force's Board was comprised of representatives of the member counties and municipalities.

Federal Rule of Civil Procedure 17(b) provides:

(b) Capacity to Sue or be Sued. The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to

sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States.

The Supreme Court has stated that "a plaintiff may proceed in the District Court ... against an unincorporated [association] in its common name if, by the law of the [State], it has capacity to be sued as such. Only if it be decided that by the local law such a [party defendant] does not have capacity to be sued in its own name need there be consideration of the second part of Rule 17(b), which permits a suit against an unincorporated association for the enforcement of 'a substantive right existing under the Constitution or laws of the United States.'" *Busby v. Electric Utilities Employees Union,* 323 U.S. 72, 73, 65 S.Ct. 142, 143 (1944).

Chapter 791 of the Texas Government Code and Chapter 362 of the Texas Local Government Code, which allow creation of multi-jurisdiction police task forces, have no express provisions allowing such task forces to sue or be sued. Plaintiff argues in part that there is a "necessary implication" that the Task Force may sue and be sued, or at least be sued, because: a) if it cannot be directly sued itself, then Plaintiff has no real remedy for the wrongs committed against him, and b) Texas laws do not expressly state that task forces cannot be sued. The Court concludes that: (1) Plaintiff is incorrect in his first position because the City of Amarillo is potentially liable on Plaintiff's claims, and (2) Texas law is contrary to Plaintiff's second argument. Under Texas law, governmental entities cannot abdicate, delegate, or "contract away" their law enforcement responsibilities unless the Texas legislature expressly permits them to do so. *See Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1988); *Pittman v. City of Amarillo*, 598 S.W.2d 941, 945 (Tex.

Civ. App. – Amarillo *writ ref'd n.r.e.*). It should also be noted that § 362.003(a) of the Texas Local Government Code regarding Provisions Relating to Law Enforcement Officers provides:

> While a law enforcement officer regularly employed by one county, municipality, or joint airport is in the service of another county, municipality, or joint airport according to this chapter, the officer is a peace officer of the latter county, municipality, or joint airport and is under the command of the law enforcement officer who is in charge in that county, municipality, or joint airport.

The Court must next address whether an inter-governmental law enforcement unit such as the Task Force can be sued pursuant to Rule 17(b)(1). This Count concludes that it cannot. *Brown v. Fifth Judicial Dist. Drug Task Force,* 255 F.3d 475, 476-77 (8th Cir. 2001)(multi-city, multi-county, unincorporated, intergovernmental, multi-jurisdictional drug task force could not be sued because it has no separate legal existence and has not been granted statutory authority to sue or be sued; "authorities more directly on point appear to be uniform in holding that drug task forces similar to the defendant in this case are not separate legal entities subject to suit."); *Hervey v. Estes,* 65 F.3d 784, 791-92 (9th Cir. 1995)(intergovernmental drug task force was not "person" or entity subject to suit under §1983); *Dean v. Barber*, 951 F.2d 1210, 1215 n.4 (11th Cir. 1992)(Rule 17(b) does not apply to governmental units, subdivisions or agencies); *Eversole v. Steel*, 59 F.3d 710, 716 n.6 (7th Cir. 1995)(holding that a multi-county, multi-city drug task force comprised of officers from four counties and several municipalities was not an official entity); *Erie Human Relations Comm. v. Tullio*, 493 F.2d 371, 376 (3rd Cir. 1974) (Adams, J., concurring)(suggesting that Rule 17(b) applies only to private entities that are well-established representatives of groups of people, such as labor organizations); *Dillon v. Jefferson County Sheriff's Dept.*, 973 F.Supp. 626, 627-28 (E.D. Tex. 1997)(narcotics task force could not be sued because the intergovernmental agreements did not create a separate legal entity capable of suing or being sued).

This holding is consistent with the general rule that law enforcement agencies are not separate governmental entities that can be sued. *See Alcala v. Dallas County Sheriff*, 988 F.2d 1210 (5th Cir. 1993)(affirming without opinion trial court's conclusion that county sheriff's office could not be sued under Title VII because under Texas law it is not a separate legal entity capable of being sued); *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313-14 (5th Cir. 1991)(stating that Texas county sheriffs and city police departments are not legal entities capable of being sued unless the true political entity takes express steps to grant agency jural authority); *Alexander v. City of Rockwall,* 1998 WL 684255 (N.D. Tex. 1998)(dismissing claims against multi-city drug task force because Texas Local Govt. Code, its enabling legislation, clearly demonstrates no intent to create a separate legal entity with capacity to be sued or to engage in litigation separate from contracting municipalities); *Jacobs v. Port Neches Police Dep't*, 915 F.Supp. 842, 843 (E.D. Tex. 1996) (dismissing §§1983 and 1985 claims against county sheriff's department and county district attorney's office because under Texas law neither is legal entity capable of being sued, absent express grant of jural authority by county).

Neither Texas law nor the intergovernmental agreements demonstrate an intention to create a separate entity with jural authority.

**The City of Amarillo**

There is summary judgment evidence that the detention of Plaintiff was pursuant to the policies and customs of the City of Amarillo as developed by its policy maker, the Chief of Police. Questions of fact concerning the City's policy and whether the detention was unconstitutionally prolonged preclude summary judgment for the City on Plaintiff's claim of unconstitutional detention.

**The Counties**

A deputy sheriff from each of Potter, Randall, and Swisher counties as Task Force members participated in the raid but not in the initial entry. Neither the sheriff nor any other person who could be characterized as a policy-making official for any of the counties in question was personally involved in the incident, nor was there a failure to train or supervise that under the standards already set forth in this opinion resulted in any constitutional violation. No policy of the counties caused a violation of Plaintiff's rights, if a violation occurred. Accordingly, the counties cannot be found liable. *Coone v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986).

**Sheriff Stewart and Lt. Amos**

Sheriff Stewart and Lt. Amos have been sued individually. Each denies liability and claims qualified immunity.

Since qualified immunity depends on whether the defendant violated a clearly established constitutional right, a preliminary inquiry must be made whether the plaintiff has asserted a violation of any constitutional right at all. *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789.

If the initial inquiry is satisfied, the second prong of the qualified immunity test must be considered: whether the constitutional right alleged to have been violated was clearly established at the time of the incident; and, if so, whether the conduct of the defendant was objectively unreasonable in light of contemporaneous clearly-established law. *Hare v. City of Corinth*, 135 F.3d 320, 328 (1998). Analysis under the first prong requires the court to consider currently applicable constitutional standards. Analysis under the second prong requires a court to measure the objective reasonableness of an official's conduct with reference to the law as it existed at the time of the conduct in question. *Id.* (citing *Rankin v. Klevenhagen*, 5 F.3d 103, 108 (5th Cir. 1993). In analyzing

a claim of qualified immunity, the test is objective reasonableness, not subjective deliberate indifference. *Hare v. City of Corinth*, 135 F.3d 320, 328 (1998) (quoting *Briecke v. Coughlin*, No. 92-CV-1211, 1994 WL 705328 at 6 (N.D.N.Y. Dec. 16, 1994).

Sheriff Stewart was not at the scene. He, in fact, did not know that the raid was going to take place. Lt. Amos was at the scene briefly, approximately 5 or 10 minutes after the premises was secured. He did not personally participate in any challenged activity.

The summary judgment evidence negates liability under currently applicable constitutional standards for either Sheriff Stewart or Lt. Amos for failure to supervise. Neither Sheriff Stewart nor Lt. Amos have violated Plaintiff's constitutional right to be free from unconstitutional detention.

The Court, therefore, need not address the second prong of the claim of qualified immunity, i.e., whether the detention of Plaintiff was a detention that violated a right that was clearly established at the time of the December 13, 2001, incident.

## Conclusion

Summary judgment will be entered for the City of Amarillo on all claims, except for Plaintiff's claim for unconstitutional detention. The suit against the Task Force will be dismissed. Summary judgment will be entered for all other defendants on all of Plaintiff's claims.

It is so ORDERED.

Signed this   22nd   day of June, 2006.

/s/ MARY LOU ROBINSON  
**Mary Lou Robinson**  
United States District Judge